# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DEMARCO ARMSTEAD,**

    **Plaintiff,**                    **:**        **Case No. 2:19-cv-4857**

    **v.**                                  **Judge Sarah D. Morrison**
                                          **Magistrate Judge Kimberly A. Jolson**

**SHERIFF DALLAS BALDWIN,** *et al.,*   **:**

    **Defendants.**

## OPINION AND ORDER

Plaintiff Demarco Armstead has instituted this action against twenty-four defendants. Sixteen are public employees (the "County Defendants") associated in some way with the Franklin County Correctional Center ("FCCC"), where Plaintiff is currently detained. Seven of the remaining eight are nurses and doctors who provide care at FCCC (the "Individual Medical Defendants"). The final defendant is the private company contracted to provide medical care at FCCC, NaphCare, Inc. ("NaphCare"). These eight defendants will be collectively referred to as the "Medical Defendants." It is not clear whether any of the Individual Medical Defendants work for FCCC, particularly because four of these individuals' identities remain unknown, but the Court assumes based on the information provided that the Individual Medical Defendants work for NaphCare.

Mr. Armstead has filed dozens of motions, nine of which are relevant here—a Motion for Temporary Restraining Order ("TRO")/Preliminary Injunction (ECF No. 4), Emergency Ex Parte Motion for Restraining Order (ECF No. 6), Motion for Protective Order (ECF No. 5), Motion to Appoint Counsel (ECF No. 7), Motion to Renew Request for Appointment of Counsel (ECF No.

62)[1], Motion for Oral Argument (ECF No. 8), Motion for Fictitious Name Status (ECF No. 9), Motion for Consideration (ECF No. 10), and Motion to Amend (ECF No. 29). Of these motions, the Medical Defendants[2] have responded to ECF No. 6 (ECF No. 55) and ECF No. 62 (ECF No. 100). The County Defendants have responded to ECF No. 6 (ECF Nos. 31, 35), attaching two exhibits (ECF Nos. 40, 41), and to ECF No. 29 (ECF No. 43). The Magistrate Judge has prepared three Reports and Recommendation ("R&R") and Orders pertaining to these motions. The first (the "November 2019 R&R") was filed on November 27, 2019 (ECF No. 22); the second (the "December 2019 R&R") on December 18, 2019 (ECF No. 46); and the third (the "January 2020 R&R") on January 14, 2020 (ECF No. 78). The Court has conducted a *de novo* review as to all of these motions and related filings, as well as the three R&Rs.

In the November 2019 R&R, the Magistrate Judge recommended that the Motion for TRO/Preliminary Injunction be denied on the grounds that Mr. Armstead's motion was too vague to allow the Court to discern the type of extraordinary relief that he was seeking. (ECF No. 22, at 5–6.) However, the Magistrate found the Emergency Ex Parte Motion for a Restraining Order to be sufficiently specific and sufficiently troubling that she ordered a response from Defendants. (*Id.* at 6.) The Magistrate denied the Motion to Appoint Counsel on the grounds that it was premature because the Court was not yet able to evaluate the merits of the claims. (*Id.* at 8.) The Magistrate also ordered that ECF Nos. 5, 8, 9, and 10 be denied. Finally, the Magistrate Judge recommended that other motions be granted, but these decisions have not been objected to and do not require this Court's review.

---

[1] The Court construes this motion as a Motion for Reconsideration of the Magistrate's Order denying Mr. Armstead's request for counsel.

[2] This Response only purports to be on behalf of the identified Medical Defendants, but the Court assumes that, at least at this point, it applies equally to those Medical Defendants not yet identified.

Mr. Armstead objected to the recommended denial of his Motion for TRO/Preliminary Injunction and to the denial of his Motion to Appoint Counsel (ECF No. 27), and the Court reviews both determinations below. The Court will not review any of the other motions denied by the November 2019 R&R because it does not appear that Mr. Armstead has objected to them and to the extent he has, the Court concurs with the Magistrate's analysis and conclusions.

In the December 2019 R&R, the Magistrate recommended that Mr. Armstead's Motion to Amend be granted in part and denied in part. (ECF No. 46.) The Court concurs with the Magistrate's analysis and conclusion, and no party has objected. The Magistrate also granted in part and denied in part the Medical Defendants' Motion for Extension of Time to respond to Plaintiff's Emergency Ex Parte Motion for Restraining Order. (ECF No. 45.) Mr. Armstead objected to this extension of time (ECF No. 52); however, the Court finds his objections to be meritless. Accordingly, the Court **OVERRULES** Mr. Armstead's objections to the December 2019 R&R and **ADOPTS** the December 2019 R&R in full.

In the January 2020 R&R, the Magistrate recommended that Mr. Armstead's Emergency Ex Parte Motion for Restraining Order be denied (ECF No. 78), a determination that the Court now reviews. Mr. Armstead has filed objections to the January 2020 R&R. (ECF No. 84.) The Court considers Mr. Armstead's Motion for TRO/Preliminary Injunction and Emergency Ex Parte Motion for Restraining Order (the "Motions") to be duplicative and considers them together.

Mr. Armstead has also, at the eleventh hour, filed a Motion to Supplement his request for a TRO. (ECF No. 89.) Most of this motion duplicates facts that have been excessively repeated, and it serves no purpose but to expand an already-voluminous record. To the extent that the motion presents new information, there is no reason why much of this information could not

have been—and should not have been—presented before in the hundreds of pages that Mr. Armstead has previously filed with this Court. Even to the extent that this information could not have been presented sooner, none of the conclusory and sparse statements provided merit the extraordinary remedy of a TRO. The Motion to Supplement is **DENIED**.

## I.    BACKGROUND

Mr. Armstead has bombarded this Court with numerous lengthy, handwritten, often illegible documents, many of which are duplicative, irrelevant, and frivolous. However, the Court has endeavored to parse the important information in the record to discern the basis for the requested relief. While Mr. Armstead makes a litany of allegations against Defendants, only his allegations that Defendants have acted with deliberate indifference in depriving him of his HIV medication are relevant to the Motions.[3] As far as the Court can tell, the facts relevant to that claim are as follows.

Mr. Armstead has been detained at FCCC since March 16, 2019. (Compl., ECF No. 23, at 1.) Initially, Mr. Armstead was detained pending trial; on December 10, 2019, he pleaded guilty to Attempted Felonious Assault and is now awaiting sentencing.[4] *State of Ohio v. Armstead*, 19-CR-1437 (Ct. of Common Pleas of Franklin Cty., Ohio). Since at least the time of his detention, he has had a prescription for Stribild, which he is to take daily to treat his HIV. (ECF No. 20, at 1; County Def. Ex. A, at 1, 6, 12, ECF No. 40.) However, Mr. Armstead alleges that FCCC has been inconsistent in administering this medication to him.

---

[3] Mr. Armstead now belatedly asserts that he is also seeking a TRO related to three bullets lodged in his body. (ECF No. 84, at 1; ECF No. 89, at 2.) While he has mentioned these issues previously, (*see, e.g.*, ECF No. 23, at 1; ECF No. 27, at 2), he has never mentioned this information in the context of the extraordinary relief that he was seeking. Nor has Mr. Armstead established any facts that would warrant a TRO beyond the relief already contemplated regarding his HIV medication.

[4] Mr. Armstead represents that he is "in the process of withdrawing [his guilty] plea . . . ." (ECF No. 84, at 1.)

Defendants have provided medication administration records for the first 305 days of Mr. Armstead's confinement, from March 16, 2019, through January 14, 2020. (*See* County Def. Ex. A; ECF No. 82-1.) Of these 305 days, Defendants concede that Mr. Armstead's medication was out of stock (and thus not administered) on six days—5/3/19, 5/4/19, 5/5/19, 6/24/19, 7/18/19, and 11/10/19. (County Def. Ex. A, at 3, 9, 10, 15.) There are nineteen dates missing from these records—3/17/19, 3/27/19, 5/8/19, 5/19/19, 5/23/19, 6/3/19, 6/6/19, 6/23/19, 7/16/19, 7/25/19, 7/29/19, 7/30/19, 8/9/19, 8/14/19, 8/26/19, 10/6/19, 10/22/19, 11/21/19, and 12/9/19.[5] (*See id.*) Defendants claim that Mr. Armstead was a "No Show for [the] Medication Pass" on seven occasions—4/8/19, 4/9/19, 5/16/19, 6/29/19, 7/2/19, 8/2/19, and 12/18/19—and that he refused his medication on six occasions—3/16/19, 5/6/19, 5/31/19, 7/19/19, 12/27/19, and 1/7/20. (*Id.* at 8–10, 13–16, 18; ECF No. 82-1.)

For his part, Mr. Armstead alleges that during this time period he was not given his medication on twenty-four days. He claims that:

- For whatever reason, he did not get his medication for the first three days he was in custody—3/16/19, 3/17/19, and 3/18/19. (ECF No. 23, at 1; ECF No. 29, at 2.)

- His medication was out of stock on nine separate occasions—5/3/19, 5/4/19, 5/5/19, 5/6/19, 6/23/19, 6/24/19, 7/18/19, 7/19/19, and 11/10/19. (ECF No. 23, at 1; ECF No. 29, at 2.)

- Four times during Ramadan the nurse failed to deliver his medication after sundown after his daily fast had concluded—5/12/19, 5/16/19, 5/19/19, and 5/26/19. (ECF No. 23, at 1; ECF No. 29, at 2.)

---

[5] There is a partial record from 12/9 that says that *something* was administered on that day, but the record does not say what was administered and this portion of the record has been crossed out by Defendants. (Ex. A, at 5.) The Court must assume that this does not document an administration of Stribild.

- The nurse refused to administer his medication on two occasions—4/30/19 and 11/21/19. (ECF No. 23, at 1; ECF No. 42, at 2–3.)

- The medical staff failed to alert him to take his medication on four occasions—6/6/19, 6/29/19, 7/2/19, and 8/2/19. (ECF No. 23, at 2; ECF No. 29, at 2.)

- And he was not given his medication on 12/18/19 or 12/27/19, although the reasons why are not clear. (ECF No. 52, at 4; ECF No. 73, at 4.)

Mr. Armstead has filed sick call requests and grievances as to his missed medication doses and alleges that he has often not received a response. (ECF No. 23, at 1–2.)

According to the National Institutes of Health, Stribild is a drug cocktail that helps people with HIV live longer, healthier lives and reduces the risk of HIV transmission. (County Def. Ex. A, at 21.) Stribild's instructions require that Stribild be taken with food. (*Id.*) The instructions also warn those taking Stribild not to cut down, skip, or stop taking their medications unless instructed by a health care provider. (*Id.*) If an individual taking Stribild misses a dose, that individual is supposed to take the missed dose "as soon as" he/she remembers it, unless it is almost time for his/her next dose. (*Id.* at 22.) Two doses should not be taken at the same time. (*See id.* at 21–22 ("If you take too much Stribild, contact your health care provider or local poison control center . . . right away, or go to the nearest hospital emergency room.").)

Stribild's effectiveness stems from its ability to suppress the HIV virus. (*See* ECF No. 23-4, at 4.) According to NAM, a British HIV/AIDS nonprofit, in order to maintain virologic suppression adherence to this antiretroviral regimen generally should not fall below 95%. (ECF No. 23, at 2; ECF No. 23-4, at 2, 7); *see also* R.J. Smith, *Adherence to antiretroviral HIV drugs: how many doses can you miss before resistance emerges?* 273 Proc. of Royal Soc'y B 617, 617 (noting that 95% adherence is required to maintain virologic suppression). This means that an

individual should not miss, on average, more than one dose per month. (*See* ECF No. 23-4, at 7.) Poor adherence can have multiple harmful consequences including increasing the HIV virus's ability to multiply, weakening the individual's immune system, and increasing the likelihood that the virus will become resistant to antiretroviral drugs. (*See* ECF No. 23-4, at 3–4, 6.) Mr. Armstead alleges that while his viral levels were undetectable prior to being detained, when his levels were tested in June 2019, they were detectable, and his doctor opined that the missed medication doses could be the reason. (ECF No. 23, at 2.) When his viral levels were tested again in November, they remained detectable. (ECF No. 27, at 1.)

On November 4, 2019, Mr. Armstead filed a series of documents with this Court, including his Complaint (ECF No. 1-2) and the Motions (ECF Nos. 4, 6). In the Motions, Mr. Armstead nominally requests that the named defendants be barred from contacting him and that he be immediately released from FCCC. (ECF No. 4.)

## II.   DISCUSSION

### A.  Request for TRO/Preliminary Injunction

#### 1.  Standard of Review

The Court must consider four factors in determining whether to issue a TRO or preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable harm; (3) whether the TRO or preliminary injunction would substantially harm third parties; and (4) whether the TRO or preliminary injunction would serve the public interest. *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 304 (6th Cir. 2019). These four factors are not prerequisites, but rather they are to be balanced. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Dispositive weight should not necessarily be given to one factor over the others. *York*, 787 F. App'x at 304–

05. The ultimate purpose of a preliminary injunction is "'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997)).

Because the plaintiff is *pro se*, his pleadings are held to less stringent standards than those drafted by lawyers. *Williams v. Browman*, 981 F.2d 901, 903 (6th Cir. 1992). In particular, documents filed after the complaint will be considered "as part of the pleadings." *Brown v. Matauszak*, 415 F. App'x 608, 613 (6th Cir. 2011) (internal quotation marks omitted).[6]

### 2. Analysis

#### a. Likelihood of Success on the Merits

Although the first factor is not controlling, a finding that the movant has no likelihood of success on the merits is "usually" fatal. *Handel's Enters. v. Schulenburg*, 765 F. App'x 117, 121 (6th Cir. 2019). A plaintiff seeking a preliminary injunction need not prove his entire case before getting relief. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007). What the plaintiff must show is "more than a mere possibility of success." *Six Clinics*, 119 F.3d at 402. "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

---

[6] In addition to the increased latitude for *pro se* plaintiffs, Mr. Armstead has signed the dozens of documents submitted to the Court under penalty of perjury, so the Court construes these documents as affidavits in support of the Motions.

###### i. Legal Standards Governing an Eighth Amendment Claim

NaphCare and FCCC are legally obligated to provide Mr. Armstead with his prescribed Stribild. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."); *Adkins v. Morgan Cty.*, No. 19-5252, 2020 WL 113910, at *5 (6th Cir. Jan. 8, 2020) ("[I]t is clearly established that, generally, a failure to provide necessary medical treatment to those who are incarcerated can constitute a violation of the Eighth Amendment."). Defendants do not appear to dispute this. Nor do they dispute that they have not perfectly administered to Mr. Armstead his daily dose of Stribild. Indeed, Defendants' own administration records confirm that they ran out of his medication on at least six occasions. The key question is whether Defendants' failings have risen to the level of a constitutional violation.

A prisoner states an Eighth Amendment claim for denial of adequate medical care when he alleges that prison or jail officials have acted with "deliberate indifference" to his "serious medical needs." *Adkins*, 2020 WL 113910, at *3. This deliberate indifference standard has both an objective and subjective component.[7] *Id.* The objective component requires proof of a sufficiently serious medical need where the conditions under which the plaintiff is incarcerated pose a substantial risk of serious harm. *Id.* The Magistrate Judge found Mr. Armstead's HIV

---

[7] Given intervening changes in the law, it remains an open question whether a pretrial detainee (like Mr. Armstead) must prove the subjective component. *See Richmond v. Huq*, 885 F.3d 928, 938 n.3 (2018) (noting circuit split but declining to address the issue). The Court need not address this issue at this time given the Court's determination that even assuming a constitutional violation previously occurred, Defendants have affirmatively acted to prevent any future violation.

diagnosis to constitute a sufficiently serious medical need, (ECF No. 78, at 6), and the Court agrees.

The subjective component requires proof of "a state of mind more blameworthy than negligence" and more than an "'ordinary lack of due care for [a] prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). However, it does not require proof of a purposeful, or even knowing, act or omission. *Id.* at 836. What the subjective component requires is proof "that the defendant both knew of and disregarded a substantial risk to the plaintiff's health." *Adkins*, 2020 WL 113910, at *3. Acting with deliberate indifference is "'tantamount to [an] intent to punish.'" *Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (quoting *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).

What the plaintiff must prove is that the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that he drew that inference. *Farmer*, 511 U.S. at 837. When a medical provider is "directly informed" of a prisoner's medical issues and fails to "act upon that information to ensure the provision of adequate medical care," the subjective component is satisfied. *Adkins*, 2020 WL 113910, at *3. Because of the difficulty in proving an official's state of mind, the subjective component may be proven through circumstantial evidence. *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015). A court may also "'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

## ii. The Magistrate Judge's Conclusions as to the Subjective Component

The Magistrate Judge broadly laid out the correct standards for assessing an Eighth Amendment claim, but she misapplied these standards to the facts of Mr. Armstead's case in three ways. First, the Magistrate put excessive weight on the fact that Mr. Armstead was usually administered his prescription. (*See* ECF No. 78, at 6 (highlighting that Mr. Armstead alleges missing approximately twenty doses of his medication but received over 230).) The Court agrees that this is necessary context and that occasional missed doses resulting from mere negligence do not constitute deliberate indifference. However, the fact that Defendants sometimes—even usually—duly administered Mr. Armstead's medication cannot immunize them from liability. *See Adkins*, 2020 WL 113910, at *3 ("We decline to adopt an approach whereby an official's provision of medical care to an inmate in one instance shields that official from liability when he or she is deliberately indifferent to a later medical need that arises for the inmate."). What matters more for purposes of Mr. Armstead's claims, and his Motions, are the circumstances surrounding when he was *denied* medical care versus the circumstances surrounding when he was given the care that he was constitutionally due.

Second, the Magistrate heightened Mr. Armstead's burden at various points of her analysis by requiring him to prove intentional action, rather than deliberate indifference. (ECF No. 78, at 8 ("Plaintiff has failed to allege much less establish that Defendants intentionally withheld his medicine."); *id.* ([T]here is nothing to suggest that Defendants, in failing to wake Plaintiff for his medication or administering the medication after Ramadan, intentionally withheld Plaintiff's medication.").)[8] For example, the Magistrate Judge concluded that

---

[8] The necessary state of a mind for a defendant prison official is "more blameworthy than negligence." *Farmer*, 511 U.S. at 835. But it is less than purposeful or even knowing action. *Id.* Here, the Magistrate focused on the "tantamount to intent to punish" standard identified in *Broyles*. To say that a prison official acted "tantamount"

Defendants' failure to return to Mr. Armstead's cell after the conclusion of his Ramadan fast did not constitute an intentional deprivation of his medication. (ECF No. 78, at 8.) The correct question was whether Defendants' failure to return to his cell after the conclusion of the fast demonstrated deliberate indifference rather than an intentional deprivation.

Third, the Magistrate Judge, as well as the County Defendants and the Medical Defendants alike, have excessively focused on case law relating to disputes over medical *judgment* rather than cases involving culpably deficient care. (ECF No. 78, at 6–7; ECF No. 35, at 5; ECF No. 55, at 6.) The cases cited from this body of law deal with disagreements stemming from purposeful medical decisions rather than the consequences of obvious medical mistakes. *See, e.g.*, *Rhinehart v. Scutt*, 509 F. App'x 510, 511 (6th Cir. 2013) (noting that primary dispute surrounding plaintiff's motion was a disagreement between prison physicians and doctor hired by plaintiff's family); *Owens v. O'Dea*, No. 97-5517, 1998 WL 344063, at *1, *4 (6th Cir. May 27, 1998) (denying Eighth Amendment claim premised on doctor's discontinuation of prisoner's prescription while continuing to monitor prisoner's white blood cell count); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally *reluctant to second guess medical judgments . . . .*" (emphasis added)); *Couch v. Ahmed*, No. 1:14-CV-751, 2015 WL 5145552, at *3 (S.D. Ohio Sept. 1, 2015) ("[A] prisoner's disagreement with the adequacy of treatment by prison medical professionals does not suffice to establish a likelihood of success on the merits."); *Manley v. LNU*, No. 13-13877, 2014 WL 4609129, at *5 (E.D. Mich. May 14, 2014) ("While Plaintiff disagreed with Dr. Squier's medical judgment and desired to

---

to an intent to punish would mean not that he or she *actually* acted with intent to punish but had acted *as if he or she had* such an intent or with the same *effect* as if he or she had an intent to punish. *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/tantamount (last visited Feb. 7, 2020) (defining "tantamount" as "equivalent in value, significance, or effect").

have treatment contrary to that judgment, this disagreement does not rise to the level of a federal constitutional claim."), *report and recommendation adopted sub nom.*, *Manley v. Corizon Healthcare*, 2014 WL 4609862 (E.D. Mich. Sept. 15, 2014).

Defendants do not argue that Mr. Armstead has missed doses based on the "medical judgment" of NaphCare and its staff, nor is there anything in the record to support such an argument. There is no dispute about the appropriate course of treatment—Mr. Armstead must take Stribild every day. NaphCare and its employees did not make a medical judgment that Mr. Armstead should miss some of his Stribild doses. Accordingly, the question here is not whether Mr. Armstead's care was medically sound. It objectively was not. Rather, the question is whether NaphCare and its employees acted with deliberate indifference and whether the missed doses rise to the level of a constitutional violation.

### iii. Medication Administration Records

As detailed above, Defendants have provided Mr. Armstead's medication records from when he entered custody on March 16, 2019, through January 14, 2020, a total of 305 days. Of those 305 days, Defendants' records show that Mr. Armstead was administered his Stribild medication on 267 of them. Nineteen of the thirty-eight days on which no dose is recorded are missing from the records entirely, and the Court draws an adverse inference from this lack of evidence of administration on these days. *See Digital Filing Sys., LLC v. Aditya Int'l*, 323 F. App'x 407, 418 (6th Cir. 2009) ("[Based on the] defendant's failure to come forth with accurate or complete records, a court may draw adverse inferences from this lack of information."). Defendants cannot ask the Court to pick and choose which aspects of their records to trust.

The Court turns first to the undisputed evidence that supports Mr. Armstead's allegations of missed doses. The parties agree that the medication was out of stock on at least six days.

There are an additional four days when Mr. Armstead alleges that he was not given his medication where there is no administration information in Defendants' records (3/17/19, 5/19/19, 6/6/19, 6/23/19). The Court treats Mr. Armstead's allegations as true for these four days based on the lack of competing evidence. Thus, at a minimum, there are ten days out of 305 when Mr. Armstead was not administered his medication, an adherence rate of approximately 96.7%.

As for the days where the parties affirmatively dispute whether Mr. Armstead received his medication and why, it is difficult to discern at this time whose story is accurate. On some of the disputed days, Defendants allege that Mr. Armstead either refused his medication or did not "[s]how" for the "[m]edication [p]ass." Of course, Mr. Armstead cannot base an Eighth Amendment claim on deprivations of his own making, so the Court will not consider any missed doses attributable to Mr. Armstead.

For his part, Mr. Armstead denies having ever refused to take his Stribild. (ECF No. 84, at 8.) There is no evidence in the record that might explain why Mr. Armstead would refuse to take the medication (e.g., adverse side effects). Rather, the importance of this issue to Mr. Armstead is demonstrated by the lengths that he has gone to try to vindicate the rights that he feels have been violated through his frequent submission of sick call requests and health care grievances, followed by this litigation.

It is also notable that two of the six days when Defendants claim Mr. Armstead refused his medication (5/6/19 and 7/19/19) came after a period when Defendants concede they had run out of Stribild. Moreover, the 5/6/19 date occurred during Ramadan. If Mr. Armstead refused because he was fasting, it is not the case that Defendants are entirely in the clear due to their obligations to make efforts to accommodate his religious exercise. *See* 42 U.S.C. § 2000cc-1(a).

There may also be reason to doubt some records stating that Mr. Armstead had refused his medication. For example, on 5/31, a day on which Mr. Armstead says that he did receive his medication, his medical records show that at 8:19pm, he was administered a heartburn medication and, at the exact same time, refused his Stribild. (County Def. Ex. B, at 44, ECF No. 41.) It is strange enough that Mr. Armstead would accept a medication for heartburn but reject his HIV medication. Stranger is the fact that, according to Defendants' records, Mr. Armstead has refused this same heartburn medication on *multiple* occasions. (*See, e.g.*, *id.* at 53–58.) One possible inference to draw from this is that the nurse transposed the notes for these medications and that Mr. Armstead refused the heartburn medication and was administered his Stribild. Such an error could sow additional doubt in the credibility of these drug administration records.

As for the "No Show for Medication Pass" rationale, it is difficult to credit this explanation without any evidence as to the efforts that the FCCC medical staff have made to alert him of their presence. In particular, Mr. Armstead claims that he suffers from "lethargia" [sic] and an "excessive need for sleep" that he likens to "blacking out." It is not clear whether this is due to a medical condition, side effects from one of his medications, or some other reason, although Mr. Armstead asserts that it is at least in part due to his medical conditions and his missed doses of Stribild. (ECF No. 84, at 1, 3.) The Court does not agree with NaphCare that it is *necessarily* Mr. Armstead's responsibility to "get up" for his medication. (ECF No. 23-3, at 61.) If he is medically unable to do so, for example, the nurse cannot just pass by Mr. Armstead's cell without making any effort to rouse or otherwise assist him. Mr. Armstead argues that he is not able to "get up" for medication when he is not even aware that the medication is being administered. (ECF No. 84, at 4.) The nurses presenting Mr. Armstead's medication have a greater obligation than indifferent passivity. *Cf. Jones v. Flowers*, 547 U.S. 220, 229–30 (2006)

(imposing obligation, in due process context, to take reasonable steps to ensure actual notice of tax sale). Given the paucity of information, the Court cannot necessarily conclude that the relevant Defendants have acted inappropriately in these circumstances, but there is certainly cause for skepticism.

Even beyond the nineteen dates entirely missing from the medical records and the suspicious excuses for Mr. Armstead's missed doses, there is other evidence that NaphCare's medication administration has been subpar. In particular, the limited records[9] provided appear to contain evidence of NaphCare's failure to properly administer Mr. Armstead's other medications. For example, on 5/29/19, Mr. Armstead began a course of a corticosteroid that was prescribed to be administered twice per day for ten days, for a total of twenty administrations. (County Def. Ex. A, at 13.) However, Mr. Armstead's records show that he was only administered this medication sixteen times. (*Id.*; County Def. Ex. B, at 41–43.)

### iv.    Medical Defendants' Defenses

The Medical Defendants provide a number of reasons why they believe that the Motions should be denied; a few require special attention. The Medical Defendants fault Mr. Armstead for not placing verifying medical evidence in the record. (ECF No. 55, at 8.) First, this is wrong as a legal matter. "The requirement that a plaintiff present verifying medical evidence is limited 'to those claims involving minor maladies or non-obvious complaints of a serious need for medical care.'" *Adkins*, 2020 WL 113910, at *4. HIV is not a minor malady, and a complaint about being deprived of HIV medication is an obvious complaint of a serious need for medical care. Second, the Medical Defendants have openly acknowledged having a policy of not

---

[9] It appears from the missing pages on Defendants' Exhibit A that Defendants have not provided Mr. Armstead's full medical records but rather only the records that include information related to the administration of his Stribild. (*See* County Def. Ex. A.)

releasing medical records to prisoners. (ECF No. 23-3, at 62.) The Medical Defendants cannot fault Mr. Armstead for not producing evidence that they will not permit him to obtain.

The Individual Medical Defendants argue that Mr. Armstead has failed to assert any facts demonstrating that their "personal actions" have violated Mr. Armstead's Eighth Amendment rights. The Court sees no need to address this argument at this time. The obligation to administer Mr. Armstead's medication in accordance with his prescription is a duty shared by anyone involved in his medical care. It follows that an injunction ordering the same would be a shared duty as well. For purposes of the Motions, it does not matter whether a particular Individual Medical Defendant has violated Mr. Armstead's Eighth Amendment rights but only whether *any* of the Medical Defendants has. This is because, if the standards for a TRO or a preliminary injunction are met, then it is the case that *all* FCCC and NaphCare medical staff would be bound by any order of this Court. This is especially true because Mr. Armstead does not have a single medical provider. (*See generally* County Def. Exs. A, B.)

Finally, NaphCare argues that Mr. Armstead has inadequately pleaded a § 1983 claim for liability by a municipality contractor. "A private contractor is liable under § 1983 only when execution of the private contractor's policy or custom inflicts the alleged injury." *Perry v. Corizon Health, Inc.*, No. 17-2489, 2018 WL 3006334, at *1 (6th Cir. June 8, 2018) (citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)); *accord Parsons v. Caruso*, 491 F. App'x 597, 609 (6th Cir. 2012). Thus, in order for NaphCare to be liable, it must be the case that a policy or custom was the "moving force" behind a deprivation of Mr. Armstead's constitutional rights. *Parsons*, 491 F. App'x at 609.

NaphCare alleges that Mr. Armstead was required to plead that it had an applicable policy or procedure that caused the alleged constitutional violation. (ECF No. 55, at 9.)

NaphCare cites no cases to support this claim, and the Court is skeptical that it is correct. *Cf.*

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167–68

(1993) (criticizing heightened pleading standard in § 1983 cases and overturning Fifth Circuit

requirement that complaints plead facts to overcome defense of qualified immunity). It is only

the case that Mr. Armstead must have pleaded a factually sufficient claim that puts Defendants

on notice of the conduct alleged. *See Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014) (per

curiam) (holding that Rule 8 is focused on pleading factual sufficiency of a claim rather than a

perfect statement of the law); *Abrams v. Nucor Steel Marion, Inc.*, 694 F. App'x 974, 983 (6th

Cir. 2017) ("A plaintiff's complaint need not contain a formal legal theory of the harm alleged"

but rather it need only "provide defendants with sufficient notice of the type of harm alleged.").

This is especially true in the case of the more lenient evaluation of a *pro se* complaint. *See*

*Williams*, 981 F.2d at 903.

      The Court finds Mr. Armstead's Complaint to be adequate in this regard. He alleges a

"[f]ailure by Naphcare[,] Inc. to maintain life sustaining medication" on various dates. (ECF No.

29, at 2.) A fair implication from this statement is one of a custom of doing so. *Cf. Parsons*, 491

F. App'x at 609–10 (describing custom of how medications are ordered as potential basis for

liability). Moreover, among the cases that Mr. Armstead cites in support of his claims is *Monell*.

(ECF No. 23, at 28.) The Court construes this as part of an attempt to plead the existence of a

custom or policy.

### v.      Application of the Deliberate Indifference Standard

      Based on the above, the Court finds that there is a possibility that Mr. Armstead could

succeed on a claim that Defendants were deliberately indifferent. It is evident from the record

that Defendants were aware that there existed a serious risk of harm to Mr. Armstead. It is

difficult at this stage to discern who knew what and when, but at least some of Defendants knew that Mr. Armstead was not getting his medication at least some of the time because they knew that his medication had repeatedly run out of stock. If Defendants were not already aware of this from their own discovery, they at the very least became aware when Mr. Armstead notified them through his sick call requests and grievances. In addition, the Court concludes that the risk of Mr. Armstead being deprived of his medication was an obvious one.

However, it also appears from the record that there came a point when Defendants did something to rectify this problem. The record shows that Mr. Armstead has filed over 175 sick call requests and health care grievances. (ECF No. 58, at 4–10, 13–28, 35–37; ECF No. 23-3.) While many are illegible and/or do not deal with Mr. Armstead's HIV or his medication administration, it is apparent that NaphCare made some efforts to address at least some of Mr. Armstead's complaints. For example, on May 6, 2019, after three days of Stribild being out of stock, Mr. Armstead complained about not receiving his medication, and on May 7, 2019, a member of NaphCare's staff responded that she had verified that his medication was available to be administered to him. (ECF No. 23-3, at 28–29.) On May 18, 2019, Mr. Armstead complained that the nurses were coming to administer his medication too early before he could break his fast for Ramadan. (ECF No. 23-3, at 42.) On May 20, 2019, Amanda Lyons responded that an additional notification had been added to his chart to administer his medications after sundown. (*Id.*) On June 25, 2019, Mr. Armstead complained about not getting his medication, and on July 1, 2019, Ms. Lyons acknowledged some of the missed doses and that the nurses had been "educated [regarding the] importance of medication compliance and upkeep of stock." (ECF No. 23-3, at 79.)

This last complaint in particular is crucial to the Court's decision on injunctive relief. From 3/16/19 to 7/19/19, Mr. Armstead alleges that he missed nineteen doses, an adherence rate of only 85%. After 7/19/19, however, Mr. Armstead's medication only ran out of stock once (11/10) and he only alleges missing his medication on four other days (8/2, 11/21, 12/18, and 12/27).[10] Five missed doses in a span of over five months is a significant improvement. Focusing on the most recent information, from the beginning of November through January 14, 2020, the adherence rate (based on Mr. Armstead's allegations) was 94.7%, which, while below the 95% benchmark that appears acceptable to NAM, is a significant improvement.

Based on Mr. Armstead's allegations and the evidence in the record, it is not the case that Mr. Armstead has no likelihood of success on the merits on his Eighth Amendment claim, and the Court concludes he has shown more than a mere possibility of success. If Mr. Armstead had brought this claim last July, the Court could confidently have said that he had raised serious, substantial, difficult, and doubtful questions regarding the merits of his claim. Since July, however, there is substantial evidence that the Medical Defendants have made legitimate efforts to improve the situation, quite the opposite of deliberate indifference. Accordingly, while the harm to Mr. Armstead may be ongoing, as described in the next section, Mr. Armstead has not established Defendants' *deliberate indifference* to this ongoing harm. Thus, the Court is not convinced that there is a sufficient likelihood of success on the merits of an *ongoing* constitutional claim to justify a TRO. *Cf. Bruder v. Smith*, 215 F. App'x 412, 415 (6th Cir. 2007) (finding preliminary injunction moot where defendants ceased allegedly illegal conduct).

---

[10] That is not to say that these missed doses are not problematic. *Any* missed doses are problematic. But this comparison is a relative one. The Court concludes only that Defendants have improved from potentially constitutionally deficient care to arguably constitutionally compliant care, not that Defendants' medicinal administration was or is in any way commendable.

In his objections, Mr. Armstead relies on Defendants' refusal to accommodate his "lethargia" by failing to rouse him to administer his medication. (ECF No. 84, at 9.) As stated above, ignoring a medically incapacitated inmate may give rise to an inference of deliberate indifference. However, Mr. Armstead fails to provide facts to establish that this is an ongoing problem. While the allegations are concerning, the Court is not convinced that there is a sufficient likelihood of success on the merits of an ongoing constitutional claim.

### b.      Irreparable Harm

Regarding irreparable harm, the Magistrate concluded that Mr. Armstead's claims relate only to past instances of missed medication. However, Mr. Armstead has demonstrated that due to the unique perils associated with HIV, prior missed medication doses are potentially detrimental to his future health and survival. He has offered evidence that he must maintain at least 95% medication adherence to maintain viral suppression. Mr. Armstead has alleged that he has missed twenty-four doses, and as explained above, Defendants' own records provide significant support for these allegations. All of this means that HIV creates a unique situation where past instances of harm caused by missed medication doses have the potential to amplify any harm in the future from missed doses.

Prison officials "are not excused from ensuring adequate treatment for inmates with chronic or degenerative conditions simply because any resulting harms may remain latent or have not yet reached the point of causing acute or life-threatening injuries." *McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016). "Indeed, it is precisely the latent and incremental nature of the harms associated with such conditions that makes the provision of adequate medical care so important." *Id.* In addition, Eighth Amendment claims are cognizable not only on a theory of present harm but also an "unreasonable risk of serious damage to [a prisoner's] future health."

*Helling v. McKinney*, 509 U.S. 25, 35 (1993). Prison officials may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering . . . next week or month or year." *Id.* at 33.

Crucially, Mr. Armstead alleges 1) that his viral levels have increased to a detectable amount and 2) that his doctor concluded that this could be attributable to the missed doses. Defendants offer nothing to dispute this, and Mr. Armstead alleges—and NaphCare confirms— that Defendants have refused to provide him with the laboratory work that would support his claims. (ECF No. 73, at 14; ECF No. 23-3, at 62.) Nor have Defendants offered any evidence to indicate that they are in any way *monitoring* Mr. Armstead's viral load to ensure that the virus remains suppressed and that his HIV does not become full-blown AIDS. Mr. Armstead has offered evidence that his increased viral levels increases the risk of future missed doses and the potential of his HIV to no longer respond to the medication.

The Medical Defendants seek to ignore this obvious danger by arguing that Stribild's administration "instructions clearly contemplate an occasional missed dose, and do not cite any major concern associated with a missed dose." (ECF No. 55, at 3.) This statement is shocking and dishonest. First, it ignores the instructions' admonition to *not* cut down, skip, or stop taking the medication unless told to do so by a medical provider. The obvious reason for this warning is because doing so is ill-advised. Second, it appears that the instructions' warning against doubling up on doses to make up for a mixed dose exists not because the missed dose "is not a major concern" but that the potential toxic consequences of an overdose are an even *greater* concern. This is why the instructions recommend *immediate* medical consultation (including calling poison control or going to the emergency room) in the event of an overdose. Third, while the instructions "clearly contemplate an occasional missed dose," this is out of recognition that

humans, being human, will sometimes make a mistake and miss a dose. This aspect of the instructions is a recognition of reality, not the freewheeling call to ignore the medication's dosing instructions that the Medical Defendants seem to argue it to be.

HIV and ultimately AIDS are dangerous and deadly, and the medical evidence that Mr. Armstead has provided confirms the danger of inconsistent medical treatment. The Court finds that Mr. Armstead has alleged that he has already been harmed due to an inconsistent medical regimen and that there is a very serious risk of future harm given that as recently as 12/27, he again missed a dose. While it does appear that, Defendants' medication administration has improved since July, there is a very real risk that additional missed doses would make the risk of irreparable harm potentially catastrophic.

### c. Risk of Harm to Third Parties and Public Interest

Turning to the third factor, the County Defendants make no argument as to the risk of harm to third parties, and while the Medical Defendants nominally address this factor in their analysis, they only identify the risks of Mr. Armstead being released from FCCC. The Court concurs with the Magistrate's finding that "a temporary restraining order in this case is unlikely to substantially harm others . . . ." (ECF No. 78, at 12.) The Court fails to see how requiring that Mr. Armstead be administered his prescribed medication could possibly lead to harm to a third party except in the most imaginative hypothetical.

Finally, in a constitutional case, as here, "an inquiry into the public interest is difficult to separate from the likelihood of success on the merits because 'the public interest is promoted by the robust enforcement of constitutional rights.'" *Rhinehart*, 509 F. App'x at 516 (quoting *Am. Freedom Def. Initiative v. Suburban Mobility for Reg. Transp.*, 698 F.3d 885, 896 (6th Cir. 2012)). Importantly, the public interest is categorically *not* "served by rushing to judgment at the

expense" of a prisoner's constitutional rights. *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006). It is in the public interest to ensure the just and humane treatment of the populace as a whole, inclusive of those detained in our jails and prisons. *Cf. Farmer*, 511 U.S. at 832 ("The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones . . . ." (internal citation omitted) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981))).

Finally, the County Defendants and the Magistrate Judge emphasize the importance of avoiding undue interference into administration of the prison system. The Court readily acknowledges that this remains true in the context of prison health care. *Rhinehart*, 509 F. App'x at 516 ("[S]eparation of powers and federalism strongly discourage the federal courts from entangling themselves in the administration of state prison health care systems."). Thus, any relief ordered here must be narrowly drawn and it must be the least intrusive means necessary to correct the harm. Given Mr. Armstead's specific complaints about inconsistent medication administration, if any relief is appropriate, the Court is inclined to order that Defendants comply with Mr. Armstead's Stribild prescription (i.e., that the medication be administered every day without exception) and provide satisfactory proof of compliance to this Court. Such an order would also go hand-in-hand with viral monitoring due to Mr. Armstead's prior missed doses and his unchallenged allegation that his viral levels have increased.

The Court does not construe such narrowly tailored relief as "interference" or "entanglement" in the prison health care system. It is well-established that ordering a prison and its medical staff to provide the care that they are already legally obligated to provide does not constitute interference with the administration of the prison system. *See Hudson v. McMillian*, 503 U.S. 1, 6 (1992) ("[T]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns."); *Whitley*, 475 U.S. at 320

("[T]he State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities.").

### d.     Balancing the Factors

The Court concludes that the first factor is a close call but tips in favor of Defendants, while the second and third tip decidedly in Mr. Armstead's favor. The fourth is in equipoise. Given this balance, and because of Defendants' demonstrated efforts at improvement, the Court **DENIES** Mr. Armstead's request for the extraordinary remedy of a TRO. However, the factors are sufficiently balanced that the Court finds that careful judicial monitoring is warranted, and depending on the information provided to this Court, a preliminary injunction may be appropriate at a later date.

Accordingly, the Court **ORDERS** Defendants to file via ECF[11] Mr. Armstead's Stribild administration records with signed affidavits under penalty of perjury affirming administration of the medication on each day it was administered and explaining the dates and reasons for any missed doses. To the extent that Defendants fault Mr. Armstead for missing any doses, Defendants are directed to inform this Court of the specific efforts made to administer the medication. Administration records from January 14, 2020, through February 13, 2020, are due on February 20, 2020. Administration records and affidavits shall continue to be filed with this Court encompassing every fourteen-day period thereafter. These reports and affidavits are due seven days from the close of each fourteen-day period, (for example, the information covering the period from February 14, 2020, through February 27, 2020, will be due on March 5, 2020) until this Court orders to the contrary. The Court also **ORDERS** that Defendants monitor Mr.

---

[11] Mr. Armstead does not wish for exhibits to be submitted under seal. (ECF No. 72, at 11.) Given that these documents pertain only to his health information, the Court sees no reason to have any such documents sealed against his wishes.

Armstead's viral loads by testing his virus levels at least once per month. The results of these tests are to be filed with the Court within fourteen days of receiving the results.

## B.    APPOINTMENT OF COUNSEL

It is in this Court's discretion to request counsel for an indigent civil litigant. 28 U.S.C. § 1915(e)(1) (2018); *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993). Counsel should be requested only in "exceptional circumstances." *Id.* at 605–06. In considering whether exceptional circumstances exist, the Court should consider the type of case, the complexity of the factual and legal issues involved, and the ability of the plaintiff to represent himself. *Id.* at 606.

In her November 2019 R&R, the Magistrate determined that it was premature to request counsel. (ECF No. 22, at 8.) The Court agrees at this point, principally because the Magistrate has not completed the initial claim screen pursuant to 28 U.S.C. § 1915A. However, based on the limited aspects of this case that the Court has analyzed, it does appear that this may be one of the few exceptional cases warranting counsel.

This case is factually and legally complex. Mr. Armstead has brought a number of constitutional and statutory claims alleging, among other things, violation of his Eighth Amendment rights, his rights under RLUIPA, and unlawful retaliation for the exercise of his constitutional rights. Mr. Armstead has supported some of his claims with factual evidence, and as explained above, the Court has concerns that Mr. Armstead's constitutional rights may have been violated.

More importantly, Mr. Armstead may not be able to capably represent himself in this action. While he has done an admirable job to date given his limited resources, he is hamstrung in being able to compile the proof that would be necessary to support his claims. This is true in no small part because Defendants have prevented Mr. Armstead from being able to gather proof

to support his claims. For example, the Medical Defendants have acknowledged that they will not permit Mr. Armstead to obtain a copy of his medical records.

Of course, the Court could intervene and order discovery, but the Court is reticent to interfere with prison administration by ordering alterations or exceptions to Defendants' policies. The same is true for other types of evidence that Mr. Armstead asserts will supports his claims, including FCCC surveillance videos or the medical records of other individuals associated with FCCC. The Court doubts that Defendants would be eager to hand over such information to a prisoner, nor should they be. Therein lies the importance of an attorney. In a case like this, where a prisoner requires important materials to pursue potentially meritorious litigation but there is reason for concern regarding his handling of those materials, an attorney can properly play the role of intermediary to ensure that his or her client is not in possession of materials that he should not have.

Finally, given the medical claims at issue in this case, it may be the case that the plaintiff will require the testimony of medical experts. The Court doubts whether Mr. Armstead has the ability to find or pay such an expert. This further demonstrates the potential need for an attorney's assistance.

Because the Magistrate has not yet completed the initial claim screen pursuant to Section 1915A, Mr. Armstead's Motion for Counsel (ECF No. 62) is **DENIED** at this time.

Regarding the November 2019 R&R, the Court **OVERRULES** Mr. Armstead's objection and **ADOPTS** the November 2019 R&R (ECF No. 22). The Court **DENIES** Mr. Armstead's Motion for TRO/Preliminary Injunction (ECF No. 4).

Regarding the January 2020 R&R, the Court **OVERRULES** Mr. Armstead's objections and **DENIES** Mr. Armstead's Emergency Ex Parte Motion for Restraining Order (ECF No. 6).

## III. CONCLUSION

The Court does not find that a TRO or a preliminary injunction is warranted at this time. Accordingly, Mr. Armstead's requests for a TRO and preliminary injunction (ECF Nos. 4, 6) are **DENIED**. Defendants are **ORDERED** to file the medication administration and viral load reports previously described in compliance with the procedures described above. Mr. Armstead's Motion to Supplement the Motion for TRO (ECF No. 89) is **DENIED**. Mr. Armstead's Motion for Counsel (ECF No. 62) is **DENIED**.

Based upon the foregoing, and pursuant to Rule 72 of the Federal Rules of Civil Procedure, after a *de novo* determination of the record, this Court **OVERRULES** Mr. Armstead's objections. The Court **ADOPTS** the November 2019 R&R (ECF No. 22), **ADOPTS** the December 2019 R&R (ECF No. 46), and **ADOPTS** the January 2020 R&R (ECF No. 78).

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**